Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence MODIFIES IN PART and AFFIRMS IN PART the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant in June 1994.
3. In June, 1994 plaintiff suffered a compensable occupational disease to his right elbow. The defendant accepted compensability for this occupational disease pursuant to a Form 21 Agreement which was approved by the Industrial Commission 10 January 1995.
4. The defendant is self-insured with Key Risk Management Services as the servicing agent.
5. Plaintiff's average weekly wage reflected on the Form 21 was $394.80, yielding a compensation rate of $263.21 per week.
6. Plaintiff's tax records are admitted into evidence as Stipulated Exhibit #1.
 * * * * * * * * * * * RULING ON PLAINTIFF'S MOTION TO RE-OPEN
_____Plaintiff's motion to re-open this case for additional evidence is DENIED.
 * * * * * * * * * * *
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. In June, 1994 plaintiff was a 32-year old male employed by defendant as a hydraulic brake press operator. Plaintiff began working in that capacity for defendant in November, 1991. This position consisted of lifting pieces of metal with an electronic hoist, manually adjusting the piece of metal placed on the press, and programming the press so the metal is shaped into forks for electric pallet trucks which defendant manufactures.
2. Plaintiff has a high school equivalency education and also received extensive military training in electronics and hydraulics during his more than sixteen (16) years in the National Guard. Additionally, plaintiff is certified as an emergency medical technician.
3. In June, 1994 plaintiff began experiencing right elbow discomfort. On 5 July 1994 plaintiff sought treatment from Dr. Richard Huberman of Kinston Orthopedic. Dr. Huberman diagnosed right lateral epicondylitis, or what is commonly referred to as right tennis elbow, and administered a series of steroid injections and conservative treatment.
4. When conservative treatment failed, Dr. Huberman performed a right lateral release on 7 December 1994. Plaintiff's right elbow improved and Dr. Huberman released plaintiff to return to light duty work on 19 January 1995 with the restriction of no heavy lifting.
5. On 14 December 1994 the parties entered into a Form 21 Agreement with respect to the right elbow epicondylitis, which was approved by the Commission on 10 January 1995. Defendant paid plaintiff temporary total disability benefits at a compensation rate of $263.21 per week from 7 December 1994 through 18 January 1995.
6. On 19 January 1995, plaintiff returned to work. Defendant accommodated plaintiff's restrictions by significantly modifying his position so that he was only required to program the computer and not move heavy pieces of metal.
7. Plaintiff stopped working for defendant on 24 January 1995. Plaintiff's testimony that he stopped working due to pain from his compensable injury on advice of Dr. Huberman is not found to be credible. Dr. Huberman did not suggest that plaintiff stop working. Plaintiff told Dr. Huberman that he quit his job with defendant voluntarily. Additionally, plaintiff enrolled in a course and received his emergency medical technician certificate on 11 February 1995. Plaintiff's brother had started a company, Better Health Ambulance Service, and plaintiff went to work for his brother's company on 12 February 1995. Plaintiff continued working as a full-time EMT for his brother's ambulance service through November, 1995.
8. Plaintiff's testimony that the EMT position was not a true job and that he only worked on some occasions in his brother's company is not accepted as credible. Dr. Huberman personally observed plaintiff performing the full duties of an EMT on several occasions, using both of his arms. Based upon the greater weight of the evidence, plaintiff's EMT duties not only aggravated plaintiff's compensable right elbow problems, but also substantially contributed to the development of plaintiff's subsequent left elbow problems as well.
9. From February, 1995 through June, 1995 while working as an EMT, plaintiff's right elbow continued to improve. Plaintiff participated in a work hardening program during much of this time. On 24 July 1995 plaintiff returned to Dr. Huberman complaining of increased pain in his right elbow.
10. During the summer of 1995, plaintiff was on active duty with the National Guard in Germany. Plaintiff's duties in Germany required him to remove, replace, manufacture and repair engines in a factory setting as part of military support. Plaintiff did not perform heavy lifting during this tour of duty, but he did have to pass a physical prior to going to Germany.
11. In addition to plaintiff's tour of duty in Germany in 1995, plaintiff spent three (3) days a month on military duty sixty-five percent (65%) of the year, and two (2) days a month for the remaining thirty-five percent (35%) of the year. Plaintiff only went on two drills in 1996 and none in 1997. The record is incomplete as to the exact dates that plaintiff participated with the National Guard.
12. Plaintiff returned to Dr. Huberman on 25 September 1995 with complaints of increasing pain in his right elbow. Plaintiff informed Dr. Huberman that this pain arose due to increased activity. Dr. Huberman causally related plaintiff's increased pain to plaintiff's work as an EMT. It is also noteworthy that plaintiff's pain increased after plaintiff's summer tour with the National Guard. An MRI administered 2 October 1995 showed no neurologic basis for plaintiff's pain and Dr. Huberman referred plaintiff to Dr. Andrew Siekanowicz for soft tissue pain.
13. Plaintiff first saw Dr. Siekanowicz on 19 October 1995, less than five (5) weeks after Dr. Siekanowicz received his North Carolina Medical License. Dr. Siekanowicz had recently joined Kinston Orthopedic with Dr. Huberman and Dr. Cooper. Dr. Siekanowicz diagnosed plaintiff with right salvage tennis elbow, prescribed one month of conservative treatment, and then performed salvage tennis elbow surgery on 5 December 1995. Defendant paid plaintiff temporary total disability compensation from 7 December 1995 through 24 April 1996. Plaintiff returned to work as an emergency medical technician in his brother's ambulance business on or about 26 April, 1996 earning diminished wages. Defendant paid plaintiff partial disability compensation from 25 April 1996 through 19 May 1996 for the difference in his average weekly wage at defendant and what he made at his brother's ambulance business.
14. Dr. Siekonowicz referred plaintiff to Dr. Nirschl, a doctor in Maryland, in April, 1996 when it became apparent that plaintiff's 5 December 1995 right salvage tennis elbow surgery failed. On 20 May 1996 Dr. Nirschl performed another right salvage tennis elbow procedure. Defendant paid plaintiff temporary total disability compensation benefits from 20 May 1996 through 23 June 1996 and partial disability compensation benefits from 24 June 1996 through 9 February 1997. Plaintiff returned to work in June, 1996 at his brother's ambulance business earning diminished wages. Plaintiff did not work 5 February 1997 through 5 March 1997, but he was unable to recall why he did not work during that month.
15. At the time of hearing before the deputy commissioner plaintiff was still employed by his brother's ambulance company in a part-time capacity. Since 5 May 1997 through the date of hearing and continuing, plaintiff earned $5.50 per hour, four (4) hours per day, five (5) days a week, yielding an average weekly wage of $110.00 per week. At the time of hearing, plaintiff primarily worked as a dispatcher at the ambulance company.
16. On 24 January 1996, precisely one (1) year after plaintiff left work at defendant's plant for reasons unrelated to his compensable injury, Dr. Siekanowicz diagnosed plaintiff with left tennis elbow.
17. Dr. Siekonowicz now practices in Maryland. Dr. Edwin Cooper, from Kinston Orthopedics, has taken over plaintiff's day-to-day treatment, although plaintiff still travels some for treatment with Dr. Siekanowicz in Maryland. Dr. Cooper found that plaintiff had only moderate limitation on the right arm and full motion on the left arm, with no obvious bilateral muscle weakness. Dr. Cooper also noted plaintiff's muscular appearance despite years of alleged inactivity.
18. Greater weight is given to the opinion of Dr. Huberman over that of Dr. Siekanowicz on the issue of whether plaintiff's left elbow problems are causally related to plaintiff's compensable right elbow problems. In the Opinion of Dr. Huberman plaintiff's left elbow problems are not causally related to his compensable right elbow problems or the result of over-use of his left arm. Plaintiff's left elbow problems arose one (1) year after his right elbow problems. During that year, plaintiff worked as an EMT and every month in the National Guard, including a tour in Germany. Also, plaintiff's left elbow symptoms are not the type typically related to over-use.
19. Plaintiff saw Dr. Edwin Cooper of Kinston Orthopedic first on 24 June 1997 and then on 4 August 1997. Dr. Cooper was not plaintiff's treating physician because plaintiff was still under Dr. Siekanowicz's care. However, because Dr. Siekanowicz had relocated to Maryland, Dr. Cooper served as the local contact for medication refills. Dr. Cooper did note that plaintiff's main limitation was being unable to fully straighten out his right elbow, which is only a moderate limitation of motion. When plaintiff appeared before Dr. Cooper in 1997, he still maintained a muscular appearance and did not have any wasting of muscle tone consistent with his alleged non-use.
20. Plaintiff's left tennis elbow condition is not related to his admittedly compensable right elbow condition.
21. Little weight is accorded to the testimony of Dr. Sheldon Downes, a professor at East Carolina University with a Ph.D. degree in vocational rehabilitation. Dr. Downes met with plaintiff on one occasion for under two (2) hours on referral from plaintiff's counsel. Dr. Downes only reviewed plaintiff's medical records from Dr. W.C. Gray (which were never submitted into evidence) and those of Dr. Siekanowicz. When Dr. Downes gave the opinion that plaintiff's modified position at defendant, as well as plaintiff's current position with his brother's ambulance company, were "make work", Dr. Downes depended entirely on plaintiff's description of these positions. Dr. Downes never observed plaintiff actually working as an EMT as did Dr. Huberman. Since the basis for Dr. Downes' opinions are not found to be fully accurate, little weight is given to Dr. Downes' opinions with regard to plaintiff's vocational abilities.
22. Based on the greater weight of the evidence, the Form 21 Agreement approved by the Commission was not obtained by fraud, misrepresentation, mutual mistake or undue influence. The average weekly wage on this Form 21 accurately reflects plaintiff's wages at defendant.
24. The greater weight of the medical evidence is that at the time the record closed in this matter, plaintiff had not reached maximum medical improvement with respect to his right elbow and had not received a permanent partial disability rating; however plaintiff has been able to earn some wages. While plaintiff has requested permanent and total disability, no determination can be made on permanent disability until such time as plaintiff reaches maximum medical improvement, is rated and an election of remedies can be made.
 * * * * * * * * * * *
Based on the foregoing findings of fact and stipulations, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 7 December 1994 plaintiff suffered an admittedly compensable occupational disease arising out of and in the course of his employment with defendant which resulted in disability. N.C. Gen. Stat. § 97-2(6) and § 97-53(13).
2. As a result of plaintiff's compensable occupational disease to his right elbow, plaintiff is entitled to additional temporary partial disability benefit compensation from 9 February 1997 and continuing at the rate of sixty-six and two thirds percent (66 2/3%) of the difference in plaintiff's pre-injury average weekly wage of $394.80 and the weekly wages plaintiff actually earned for a period not to exceed three hundred (300) weeks from the date of injury in accordance with N.C. Gen. Stat. § 97-30.
3. Plaintiff is not entitled to count any wages lost from the National Guard in the computation of his average weekly wage.McAninch v. Buncombe County Schools, 347 N.C. 126,489 S.E.2d 375 (1997).
4. The greater weight of the evidence is that the Form 21 Agreement, approved by the Commission, was not obtained by fraud, misrepresentation, mutual mistake or undue influence. The terms of the Form 21 Agreement shall not be set aside. N.C. Gen. Stat. § 97-82.
5. This case was defended upon reasonable grounds and plaintiff is not entitled to attorney fees or penalties from the defendant. N.C. Gen. Stat. § 97-88.1.
6. Plaintiff is entitled to have defendant provide all medical treatment arising from plaintiff's his right elbow injury to the extent it tends to effect a cure, give relief or lessen plaintiff's disability. N.C. Gen. Stat. § 97-25.
7. Plaintiff has not reached maximum medical improvement.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. As a result of plaintiff's admittedly compensable injury of 7 December 1994, defendant shall pay to plaintiff additional temporary partial disability benefit compensation from 9 February 1997 and continuing at the rate of sixty-six and two thirds percent (66 2/3%) of the difference in plaintiff's pre-injury average weekly wage of $394.80 and the weekly wages plaintiff actually earned for a period not to exceed three hundred (300) weeks from the date of injury. These payments shall be subject to reasonable attorney's fees herein approved.
2. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the sums awarded plaintiff shall be deducted and paid directly to plaintiff's counsel.
3. Defendant shall pay all medical expenses incurred by plaintiff as a result of his compensable right elbow injury for so long as such treatments tend to effect a cure, give relief or tend to lessen plaintiff's disability.
4. Whether plaintiff is entitled to permanent and total disability or permanent partial disability is reserved for subsequent determination until such time as plaintiff reaches maximum medical improvement and is rated.
5. Plaintiff's claim for compensation for an occupational disease to his left elbow is denied.
6. Defendants shall pay the costs.
 S/ ___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ _____________________ RENÉE C. RIGGSBEE COMMISSIONER
J. Howard Bunn participated in the Full Commission's review hearing, but retired prior to decision in this case.
J. HOWARD BUNN, Jr., CHAIRMAN